[No. B108968. Second Dist., Div. Five. Aug. 12, 1998.]

PRINCIPAL MUTUAL LIFE INSURANCE COMPANY, Plaintiff and Respondent, v.
VARS, PAVE, McCORD & FREEDMAN et al., Defendants and Appellants.

1470

1472

## COUNSEL

Jerry L. Freedman, Gail V. Phillips, Robert J. Vars, in pro. per., James V. Jordan, Peterson & Ross and Karl W. Kime for Defendants and Appellants.

Allen, Matkins, Leck, Gamble & Mallory, Patrick E. Breen and Rebecca Gilbert Gundzik for Plaintiff and Respondent.

## OPINION

**GODOY PEREZ, J.**—Defendants Jerry L. Freedman and Robert J. Vars appeal from the judgment entered on behalf of plaintiff Principal Mutual

Life Insurance Company in its action for breach of a commercial lease. For the reasons set forth below, we affirm the judgment.

FACTS AND PROCEDURAL HISTORY[1]

In May 1985 the law firm of Vars, Pave, McCord & Freedman (VPMF) signed a lease for office space (the lease) in an Encino office building owned by 16030 Associates (the landlord). VPMF was a general partnership formed by lawyers Robert J. Vars, Robert Pave, James W. McCord and Jerry L. Freedman. The lease, which each partner personally guaranteed, ran for five years, starting August 1, 1985. The lease included an option to be renewed for another five years.

Relevant to this appeal are the following lease terms: paragraph 31a, which stated that the lease would be deemed subordinate to all existing and future liens and mortgages on the landlord's property; and paragraph 31c, which stated that if the landlord sold the building or lost it in foreclosure, the tenant would attorn to the landlord's successor in interest upon request, and be bound by a new lease on the same terms as the old one.[2]

---

[1]The parties stipulated at trial to most of the essential facts. As to the remaining facts, to the extent resolution of this matter turns on the existence of substantial evidence to support the judgment, we state them in the manner most favorable to the judgment, resolving all conflicts and drawing all inferences in favor of respondent. (*Aceves* v. *Regal Pale Brewing Co.* (1979) 24 Cal.3d 502, 507 [156 Cal.Rptr. 41, 595 P.2d 619].)

[2]Paragraph 31a states: "This Lease is, and at all times hereafter shall be, subject and subordinate (i) to any and all ground and underlying leases which now exist or may hereafter be executed affecting the Building or the land upon which the Building is situated or both, and (ii) to the lien of any mortgages or deeds of trust in any amount or amounts whatsoever now or hereafter placed on or against said land and Building or either of them or on Landlord's interest or estate therein, or on or against any ground or underlying lease, and to all renewals, consolidations, replacements and extensions thereof, and to all loans or advances heretofore or hereafter made upon the security thereof, all without the necessity of the execution and delivery of any further instruments on the part of Tenant to effectuate said subordination. Notwithstanding the foregoing, Tenant shall execute and deliver to Landlord such further instrument or instruments evidencing such subordination of this Lease as Landlord or its successors in interest may from time to time request."

Paragraph 31c states: "In the event that Landlord at any time sells or conveys its estate in the Building and/or the related land and real property, or any part thereof, to any other party, or in the event Landlord's estate therein is at any time acquired by any other party upon the foreclosure of any mortgage or deed of trust, or upon any termination of any ground or underlying lease to which this Lease is subordinated as provided in Section 31a hereof, or by reason of any merger or consolidation or otherwise by operation of law, (i) Tenant shall, upon request, attorn to such successor in interest and, upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such successor in interest for the remainder of the term hereof, or at the election of such successor in interest, this Lease shall automatically become a new Lease between Tenant and such successor in interest, upon all of

On June 11, 1986, plaintiff and respondent Principal Mutual Life Insurance Company (Principal) recorded a trust deed to secure a loan which it made to the landlord. In May 1990, VPMF exercised its option to renew the lease for another five years through February 1996. In February 1992, at the instigation of Freedman, Vars was asked to leave the firm. The VPMF partnership dissolved and carried on as Freedman, Pave, McCord & Jacobs. Vars moved his practice to a new location. In February 1993, Freedman voluntarily left the new partnership, which dissolved and carried on as Pave McCord & Jacobs.[3] Freedman also moved his practice to a different location. Neither Freedman nor Vars paid any rent after their respective departures from the firm.

On April 7, 1993, Principal recorded a document styled as a "Subordination Agreement" by which it purported to subordinate its trust deed to the leases of various tenants at the landlord's property, including VPMF. The stated purpose of the document was to prevent a foreclosure of the property from extinguishing those leases. The so-called subordination agreement was signed only by officers of Principal, not by any of the tenants. Principal acquired legal title to the building by way of foreclosure on August 13, 1993.

On September 15, 1993, Principal sent a letter to the firm stating that it had acquired the property, that pursuant to the terms of the lease Principal had assumed all of the landlord's lease obligations, and that it was "pleased to have you as a continuing tenant . . . under the terms of the Lease." McCord wrote back on behalf of the firm in a letter dated September 29, 1993, taking the position that Principal's foreclosure of its senior encumbrance extinguished the lease, leaving the firm as a month-to-month tenant. Principal responded in an October 15, 1993, letter, pointing out that it had subordinated its trust deed to the lease before the foreclosure. Principal also contended that the firm was obligated by paragraph 31c of the lease to enter upon request a new lease under the same terms as the old one and asked that the firm do so.

The firm paid rent from August 1993 to December 1, 1993, then stopped. On March 22, 1994, the firm notified Principal it was vacating the office

the terms and conditions hereof, for the remainder of the term hereof, and (ii) Landlord shall be relieved of any further obligations hereunder, provided that such successor in interest assumes all of such obligations of Landlord, but such successor in interest shall not become liable for any default hereunder theretofore committed by Landlord."

[3]Because the distinctions between these reconstituted versions of the original VPMF are irrelevant to our decision, for ease of reference we will hereafter refer to all of them as "the firm."

space and moved out on April 16, 1994. Principal then sued the firm and the individual partners—Vars, Pave, McCord and Freedman—for breach of the lease and to enforce the partners' personal lease guarantees.

After a bench trial in July 1996, the trial court found that the lease and guarantees were enforceable for two reasons: first, because Principal had subordinated its trust deed to the lease before the foreclosure; and second, because the attornment clause in paragraph 31c of the lease obligated the firm to recognize Principal as its landlord under the terms of the original lease. The court also found that the landlord had not agreed to release Vars or Freedman from their lease and guarantee obligations.[4] Principal was awarded more than $460,000, plus attorney's fees and costs of approximately $99,000.

The main issue on appeal is whether the firm was required to attorn to Principal and recognize it as the new landlord, or whether Principal's foreclosure of the landlord's property extinguished the lease, including the obligation to attorn. Vars and Freedman also contend that the attornment provision was unenforceable because it was vague, because it vested full control over whether the lease would continue with Principal and therefore lacked mutuality of obligation, and because Principal was a stranger to the lease with no right to enforce the guarantee. Freedman also contends that he was released from his lease and guarantee obligations by the conduct of the landlord and Principal.[5]

## Standard of Review

■ Interpretation of a lease presents a question of law which we independently review using principles of contract law. (*Miscione* v. *Barton*

---

[4]At the close of the trial on the lease obligations, the court suggested that the individual partners file cross-complaints for indemnity and contribution in order to sort out their respective liabilities. The parties did so, and the cross-complaints of the firm and Freedman included causes of action for an accounting of all the partnership assets and liabilities. The trial court then separated the trial of the lease indemnification issue from the trial of the other causes of action in those cross-complaints with the intent of rendering an appealable judgment on only that portion of the cross-complaints. The court found that Vars was entitled to total indemnity from his former partners and determined the liability percentages of the remaining partners. Freedman also appealed from that portion of the judgment, contending that he was entitled to total indemnity as well and that the partners' indemnification obligations needed to be otherwise adjusted. By order dated August 12, 1998, we dismissed that portion of the appeal because there was not yet one final and appealable judgment on the various cross-complaints. (*Morehart* v. *County of Santa Barbara* (1994) 7 Cal.4th 725, 736-744 [29 Cal.Rptr.2d 804, 872 P.2d 143].)

[5]Only Vars and Freedman appealed from the judgment. We will sometimes refer to them collectively as "appellants."

*Development Co.* (1997) 52 Cal.App.4th 1320, 1325-1326 [61 Cal.Rptr.2d 280] (hereafter *Miscione*).) In doing so, we apply certain well-known rules of contract interpretation. A contract must be interpreted to give effect to the mutual intention of the parties at the time the contract was made. (Civ. Code, § 1636.) Courts will not adopt a strained or absurd interpretation to create an ambiguity where none exists. A contract extends only to those things concerning which it appears the parties intended to contract. Our function is to determine what, in terms and substance, is contained in the contract, not to insert what has been omitted. We do not have the power to create for the parties a contract which they did not make and cannot insert language which one party now wishes were there. Finally, words used in a certain sense in one part of a contract are deemed to have been used in the same sense elsewhere. (*Levi Strauss & Co.* v. *Aetna Casualty & Surety Co.* (1986) 184 Cal.App.3d 1479, 1485-1486 [237 Cal.Rptr. 473].)

DISCUSSION

1. *Attornment, Subordination and Nondisturbance Clauses*

■ Title to real property which is conveyed after foreclosure by a trustee's deed relates back to the date the trust deed was executed. The title passed is that held by the trustor at the time of execution. Liens which attached after the foreclosed trust deed was executed are extinguished and the purchaser takes title free of those junior or subordinate liens. (*Dover Mobile Estates* v. *Fiber Form Products, Inc.* (1990) 220 Cal.App.3d 1494, 1498 [270 Cal.Rptr. 183] (hereafter *Dover*).)

This rule applies to tenants who have leased property which is later sold through foreclosure. A lease made before the foreclosed trust deed was executed survives the foreclosure and the purchaser takes the property subject to the lease. A subordinate lease, which was made after a trust deed was executed, is wiped out by the foreclosure of that deed, along with the tenant's rights and obligations under the lease. (*Dover, supra,* 220 Cal.App.3d at p. 1498.) If the tenant remains, he does so only as a holdover tenant. If the purchaser of the foreclosed property accepts rent from the tenant, a month-to-month tenancy is created. (*Id.* at p. 1501.)

■ Commercial landlords, their tenants and their lenders sometimes attempt to adjust their respective rights in the event of foreclosure by three types of lease clauses—subordination, nondisturbance and attornment (SNDA). All three are at issue here.

The parties to a real estate transaction may contractually agree to alter the priorities of encumbrances otherwise fixed by law. (*Miscione, supra,* 52

Cal.App.4th at p. 1326.) A lease may be deemed subordinate to an otherwise junior trust deed through a subordination agreement, which is " 'often used to adjust the priorities between commercial tenants and the mortgagee of the real estate, . . . . Absent such an adjustment, priorities will be governed by the recording acts and related common law principles.' [Citation.]" (*Dover, supra,* 220 Cal.App.3d at p. 1498.) Some leases include so-called "automatic subordination" clauses, by which the tenant agrees that its lease will become subordinate to any liens or encumbrances on the landlord's property which attach after the lease is executed. (6 Cal. Real Estate Law and Practice (1998) Creation of Tenancies, § 153.50, pp. 153-92-153-93.) The firm's lease included such an automatic subordination clause.

In order to protect itself from the loss of its lease through foreclosure of the landlord's property, a tenant asked to subordinate its lease to any future encumbrances may negotiate with the landlord to obtain a nondisturbance agreement from any future lenders. Such an agreement provides that a foreclosing lender with a superior lien will not disturb the tenant's possession so long as the tenant has not defaulted on the lease. (6 Cal. Real Estate Law and Practice (1998) Creation of Tenancies, § 153.50[2], p. 153-94; *Miscione, supra,* 52 Cal.App.4th at p. 1327.) McCord, who negotiated the lease on behalf of the firm in 1985, testified that: He wanted a nondisturbance clause; he was told it was not negotiable; and that such a provision was not so important that he was unwilling to sign the lease without it.

Attornment is a real property concept as old as the law itself. As originally practiced it was " 'the act of feudatory, vassal, or tenant by which he consents upon the alienation of an estate to receive a new lord or superior and transfers to him his homage and service.' " (Fisher & Goldman, *The Ritual Dance Between Lessee and Lender-Subordination, Nondisturbance, and Attornment* (1995) 30 Real Property, Prob. and Trust J. 355, 361-362, fn. omitted.) Attornment is not a fossilized concept, however, or one preserved in amber. Instead, it continues to have vitality in the commercial leasing area as " 'a corollary agreement addressing foreclosure.' [Citation.]" (*Miscione, supra,* 52 Cal.App.4th at p. 1327.) In its present form, it simply means that the tenant has agreed, or will agree, to recognize its landlord's successor in interest as its new landlord. (*Id.* at pp. 1327-1328.)

While few reported decisions have considered the operation and effect of SNDA's, they have attracted more attention in recent years. Critical to our decision are two of these—*Dover* and *Miscione.*

## 2. *The Dover and Miscione Decisions*

In *Dover, supra,* 220 Cal.App.3d 1494, tenant Fiber Form entered a five-year lease which contained an automatic subordination clause. That clause stated the lease would be subordinate to any trust deeds or mortgages encumbering the property unless the lender elected to have the lease be superior. After Fiber Form entered the lease, a second trust deed was placed on the property. That lender later foreclosed and the property was bought by Dover at the foreclosure sale. The lender never elected to have the lease be superior to its second trust deed. When Fiber Form moved out, Dover sued for breach of the lease.

Citing the general rule that foreclosure by a senior encumbrancer extinguishes the lease, the appellate court held that Fiber Form's lease had been extinguished, leaving it free to vacate the property. (*Dover, supra,* 220 Cal.App.3d at pp. 1499-1500.) This holding comports with basic notions of priorities and notice, the court said. If a trust deed is recorded before the lease, the tenant enters the lease with notice that the lease will be subordinate. If the tenant and landlord agree that the lease should be subordinate, then the tenant is aware that its lease could be extinguished by foreclosure. Since Fiber Form expressly agreed to take that risk, it made no difference that Fiber Form, not Dover, wanted the lease extinguished after the foreclosure. (*Id.* at p. 1500.)

The court rejected Dover's argument that instead of terminating the lease, foreclosure gave the buyer the option of doing so. Such a rule would let the buyer do whatever was most profitable, depending on whether rental values had gone up or down since the lease was executed. Even though the lease had been extinguished, however, ". . . the tenant and purchaser are not precluded from entering into a new lease agreement." (*Dover, supra,* 220 Cal.App.3d at p. 1500.) Finally, the court noted that the tenant under a subordinate lease could gain some protection by requiring a nondisturbance clause. In addition, the tenant could bargain with its landlord for the right to cure the landlord's default. (*Ibid.*)

In *Miscione*, tenant Barton Development (Barton) entered a lease of commercial property which contained both attornment and subordination clauses. The attornment clause stated that in the event of foreclosure, the tenant shall attorn to the new owner and recognize it as landlord under the lease, provided that the new owner acquires and accepts the property subject to the lease. The subordination clause provided that any first trust deed holder had the right to request that the tenant subordinate its lease, so long as

the tenant could first require the lender to sign a nondisturbance agreement and also provided that the holder of any security interest in the property could, upon written notice to the tenant, elect that the lease be superior to its security interest.

The property was eventually foreclosed upon by the holder of a first trust deed which predated the lease. While the foreclosing lender and its successor in interest each sought to enforce the lease against Barton, Barton took the position that the lease had been extinguished by the foreclosure pursuant to the rule in *Dover*. The trial court granted Barton summary judgment, in part on the basis that the foreclosing first trust deed holder failed to elect under the lease to have the lease become senior to the trust deed.

The *Miscione* court reversed, distinguishing *Dover* in several respects. It first noted that the subordination clause had no effect because the foreclosing lender's first trust deed predated and was therefore senior to the lease by operation of law. Since the lender had no reason to insist on subordination of the lease, and since the tenant could only demand a nondisturbance clause if it were asked to subordinate under the lease terms, then the nondisturbance clause was also of no effect, the court reasoned. (*Miscione, supra*, 52 Cal.App.4th at p. 1328.) The only potentially operative portion of the subordination provisions was the one which permitted the lender to elect that its lien become junior to the lease. That did not happen and the seniority of the lender's trust deed was therefore fixed by law. (*Ibid.*) This left the attornment clause, an issue not discussed or considered in *Dover*, and the determinative issue for the *Miscione* court. (*Id.* at p. 1329.)

Barton contended that the foreclosing lender failed to satisfy a condition precedent to invoking the attornment provision—the lease provision which required it to acquire and accept the property subject to the lease. Barton interpreted this provision to include the exercise of the lender's option to subordinate its deed to Barton's lease, an option which was part of the lease's subordination clause.

The court rejected this contention, in part because the subordination and attornment clauses were separate from and independent of each other. The subordination clause could have applied to several different parties, the court noted, and could have been used to alter the priorities of the parties with respect to insurance awards and condemnation proceeds as well as competing encumbrances. (*Miscione, supra*, 52 Cal.App.4th at p. 1330.) "However, the creation of an obligation for the tenant to attorn to a new landlord is quite different. The tenant presumably negotiated the lease with the landlord, and,

for consideration, contracted to attorn to a new landlord under the described conditions. A landlord could want such a provision in the lease for a number of reasons, not the least of which is that the landlord could show the lease to others with whom it deals to demonstrate that its tenants are bound to new landlords. Such a provision could be a persuasive argument to a lender who was considering the financial condition of the landlord or the landlord's position vis-à-vis other parties involved with the real property. *Thus, an attornment clause is not just gratuitously given in a vacuum, but has a meaning that can impact upon the rights and obligations of parties other than the immediate parties to the lease.*" (*Ibid.*, italics added.)

The court gave an additional reason for rejecting Barton's contention that the foreclosing first trust deed holder had to exercise its option to subordinate its deed to Barton's lease as a condition precedent to invocation of the attornment clause: Requiring the foreclosing lender to subordinate its senior encumbrance to the lease before the foreclosure occurs would simply make no sense. "As noted above, prior to the trustee's sale, [the lender] could not know whether it would be the successful bidder. It is illogical to expect [a lender], as a prospective purchaser at the foreclosure sale, to exercise some option provided in a separate clause of the lease. It is common to have all three parts of SNDA clauses included in leases. If we were to support the rule proposed by defendant, all lenders similarly situated . . . would have to 'exercise their option' to subordinate their position to that of the tenant before they bid in at a foreclosure sale. There is neither logic nor fairness in such a rule, and we will not promulgate it here." (*Miscione, supra,* 52 Cal.App.4th at p. 1331.)

Instead, all the foreclosing lender had to do was acquire and accept the premises subject to the lease, which it did on the day of acquisition by notifying Barton that it was the new owner and directed that all future rent payments be made to it. (*Miscione, supra,* 52 Cal.App.4th at pp. 1331-1332.) The court concluded that the attornment clause was an agreement by the tenant to alter the priorities between its lease and the first trust deed, making the lease a senior encumbrance which was not extinguished by the foreclosure. (*Id.* at pp. 1328, 1330-1332.)[6]

■ Appellants contend that *Dover* governs and that their duty to attorn was extinguished along with the lease upon foreclosure. Principal asks that we follow *Miscione* and hold that the attornment clause was enforceable after it obtained the landlord's building through foreclosure.

---

[6]Justice Hollenhorst filed a strong dissent from the majority decision, believing that under *Dover* the lease and its concomitant obligation to attorn were extinguished by the foreclosure. (*Miscione, supra,* 52 Cal.App.4th at pp. 1332-1340 (dis. opn. of Hollenhorst, Acting P. J.).)

### 3. *The Attornment Clause Was Enforceable*

#### A. *The Attornment Clause Survived Extinguishment of the Lease*

We begin by noting the utility of attornment clauses. They "assist[] the mortgagee and tenant in clarifying their rights and responsibilities in the event of foreclosure. By preserving the economic terms of the lease, attornment boosts and fosters certainty. And certainty is vitally important, not only to tenant entrepreneurs, but to portfolio-balancing mortgagees as well." (Feinstein & Keyles, *Foreclosure: Subordination, Non-Disturbance and Attornment Agreements* (1989) 3 Prob. & Property 38, 39 (hereafter, *Foreclosure*); accord, *Miscione, supra,* 52 Cal.App.4th at p. 1330.) As the *Miscione* court observed, such clauses are "not just gratuitously given in a vacuum, but [have] a meaning that can impact upon the rights and obligations of parties other than the immediate parties to the lease." (*Miscione, supra,* 52 Cal.App.4th at p. 1330.)

The attornment provision at issue here was part of the bargain struck between the firm and the landlord which, by its terms, was specifically intended to come into play after (and in the event) the property was obtained by another through foreclosure. To hold that Principal's foreclosure extinguished the firm's duty to attorn would render that clause meaningless, a violation of long-established rules of contract interpretation. (Civ. Code, § 1641; *Miscione, supra,* 52 Cal.App.4th at pp. 1329-1330.)

Appellants contend that under *Dover* it would be unfair to give Principal or any other foreclosing lender the unfettered option of either holding a tenant to its lease or forcing it to move out. While the *Dover* court held that strict application of the rule of automatic extinguishment would avoid such an inequitable result, we agree with the *Miscione* court that *Dover*'s failure to discuss and consider the effect of an attornment clause on the status of a subordinate lease after foreclosure by a senior encumbrancer renders *Dover* inapplicable here.

*Dover* focused on the terms of the lease and the tenant's reasonable expectations in the event of foreclosure. Since the automatic subordination clause meant the tenant in *Dover* agreed that its lease would be extinguished upon foreclosure, the court held the purchaser after foreclosure to the bargain struck between landlord and tenant. (*Dover, supra,* 220 Cal.App.3d at p. 1500.) Nor did *Dover* hold, as appellants suggest, that a nondisturbance clause is essential to the validity of an attornment provision. The court merely noted that the tenant could "obtain some protection by requiring the landlord to obtain from its lender a nondisturbance agreement." (*Ibid.*) The

authority cited for this proposition (6 Cal. Real Estate Law and Practice, *supra*, § 153.50, p. 153-94) makes clear that a nondisturbance provision should be negotiated at the inception of the lease. (*Ibid.*) As noted earlier, while the firm wanted such a provision, it did not believe the clause so important that it would not agree to enter the lease without one.

We part company, however, with *Miscione*'s blanket pronouncement that an attornment clause alters the priorities between lease and trust deed and therefore prevents the lease from being extinguished.

The apparent authority for this holding is a passage from *Foreclosure* cited in *Miscione*: "Under an attornment clause, a 'tenant covenants with the mortgagee that, in the event of foreclosure, the lease will not be extinguished but will continue as a lease between the mortgagee (or any successor to it) and the tenant. The tenant, in other words, agrees to recognize that another party who would not otherwise have privity may enforce the lease agreement as though the third party were originally a beneficiary of the agreement.' " (*Miscione*, *supra*, 52 Cal.App.4th at p. 1328, quoting *Foreclosure*, *supra*, 3 Prob. & Property at p. 39.)

*Foreclosure* was not a comprehensive law review article which was supported by underlying case authority. Instead, it was an overview of SNDA practice which set forth general principles applicable to all 50 states regardless of whether they followed the automatic extinguishment rule of California or the so-called "pick-and-choose" rule followed in some states, where the mortgagee must take certain actions during foreclosure in order to wipe out a subordinate lease.[7] (*Foreclosure*, *supra*, 3 Prob. & Property at p. 39.) When viewed in this context, the statement that a lease containing an attornment clause will not be extinguished cannot be considered a rule of general application, particularly in California where the law has long since been that foreclosure by a senior encumbrancer extinguishes a subordinate lease. (See, e.g., *McDermott* v. *Burke* (1860) 16 Cal. 580, 589-590.)

We think the better definition of attornment is one cited by both the majority and the dissent in *Miscione*: That attornment is the act of a tenant by which he agrees to become the tenant of the property's new owner. (*Miscione*, *supra*, 52 Cal.App.4th at pp. 1327-1328, and at p. 1335 (dis. opn. of Hollenhorst, Acting P. J.), both quoting Black's Law Dict. (6th ed. 1990) p. 130, col. 1.) When a lease obligates a tenant to attorn to a new

---

[7] We found *Foreclosure* a helpful guide to understanding the interplay between the various components of SNDA's and intend no slight to the article or its authors. Instead, we merely believe that the passage relied on by the *Miscione* court was not reliable precedential authority for the blanket proposition stated.

landlord in the event of a foreclosure by a senior encumbrancer, the terms of the attornment provision will govern how that is to occur and its effect on the existing lease.

 In *Miscione*, the tenant agreed to attorn to the new owner and recognize that party "under this Lease" so long as the new owner acquired and accepted the property "subject to this Lease." The bargain struck between landlord and tenant therefore contemplated the continued existence of their lease even after foreclosure. Based on this, the *Miscione* court correctly reasoned that the original lease was intended to survive the foreclosure sale.[8]

The attornment clause at issue here is far different. Instead of providing for the continued existence of the current lease even after foreclosure by a senior encumbrancer, the firm agreed with the landlord that the tenant would, upon request, "enter into a *new lease*, containing all of the terms and provisions of this Lease . . . or at the election of such successor in interest, this Lease shall automatically become a *new lease* . . . upon all of the terms and conditions hereof . . . ." (Italics added.) This language is significant. Reading paragraph 31 of the lease as a whole, even though the firm agreed to enter a new lease with the landlord's successor in interest, the firm and the landlord also agreed that the firm's lease would be automatically subordinated to any future encumbrances, including Principal's trust deed. Unlike the lease in *Miscione*, there was no intent that the current lease survive. By operation of law, therefore, the lease would be extinguished in the event of foreclosure. How then could the firm be required to attorn to Principal? We hold that the answer lies in the contract law doctrine of third party beneficiaries.

B. *Principal Was a Third Party Beneficiary of the Lease's Attornment Provision*

 California law permits third party beneficiaries to enforce the terms of a contract made for their benefit. Civil Code section 1559 states: "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." The third party need not be identified by name. It is sufficient if the claimant belongs to a class of persons for whose benefit it was made. (*Marina Tenants Assn.* v. *Deauville Marina Development Co.* (1986) 181 Cal.App.3d 122, 128 [226 Cal.Rptr.

---

[8]We therefore disagree with the *Miscione* court's conclusion that the attornment clause altered the priorities between Barton's lease and the first trust deed. Instead, it appears to us the parties simply contracted that the lease would not be extinguished by the foreclosure.

321].) A third party may qualify as a contract beneficiary where the contracting parties must have intended to benefit that individual, an intent which must appear in the terms of the agreement. (*Harper* v. *Wausau Ins. Co.* (1997) 56 Cal.App.4th 1079, 1087 [66 Cal.Rptr.2d 64].)

■ Appellants raise only one challenge to the applicability of third party beneficiary law. ■ In order for a third party beneficiary to enforce an agreement made by others, there must be a "valid and subsisting obligation between the promisor and the promisee." (1 Witkin, Summary of Cal. Law (9th ed. 1987) § 662, p. 601.) ■ Since the lease was extinguished by the foreclosure, appellants contend that Principal's rights under the attornment clause vanished along with it. This argument misapprehends the circumstances under which a third party beneficiary may lose its right to enforce an agreement.

■ Civil Code section 1559 provides that a third party beneficiary may enforce a contract at any time before it is rescinded. The principles governing rescission of third party beneficiary contracts are those applicable to the rescission of contracts generally. (*R. J. Cardinal Co.* v. *Ritchie* (1963) 218 Cal.App.2d 124, 149 [32 Cal.Rptr. 545].) Civil Code section 1689 governs the rescission of contracts. Under subdivision (a), both parties may consent to a rescission. (Civ. Code, § 1689, subd. (a).) Under subdivision (b), one party may unilaterally rescind based on a variety of grounds, including fraud, mistake or duress, if there has been a failure of consideration, if the contract is unlawful, or if the public interest will be prejudiced by leaving the contract intact. (See Civ. Code, § 1689, subd. (b)(1)-(7).)

If rescission has not occurred according to the statutory procedures, but the contract is instead terminated for some other reason, a third party beneficiary may still enforce the agreement. In *Pearsall* v. *Townsend* (1935) 7 Cal.App.2d 162 [45 P.2d 824] (hereafter *Pearsall*), a real estate broker entered into a real estate development agreement with Parkford and the broker hired Pearsall to do the surveying work. When a dispute arose between the broker and Parkford, the broker assigned all his interest in the subdivision to Parkford, by which Parkford agreed to pay the broker's outstanding expenses incurred for work done on the project. The broker later sued Parkford for fraud and Parkford raised the broker's fraud as an affirmative defense. The trial court found that Parkford properly terminated its contracts with the broker due to fraud and ordered the broker to pay damages. Pearsall then sued Parkford to recover for the cost of his surveying services, contending he was a third party beneficiary of the broker's assignment agreement.

The appellate court affirmed the judgment for the surveyor, rejecting Parkford's contention that the assignment had been rescinded and was therefore unenforceable. Instead of being rescinded, the contract was "merely terminated." (*Pearsall, supra,* 7 Cal.App.2d at p. 166.)

In *Mannon* v. *Pesula* (1943) 59 Cal.App.2d 597 [139 P.2d 336] (hereafter *Mannon*) the conditional buyers of certain sawmill equipment promised to pay the sellers' creditor instead of the sellers. The contract impliedly provided that in the event the buyers defaulted, the sellers and their creditor would have a security interest in the items sold. When the buyers defaulted, the creditor claimed it was entitled to the proceeds from the later sale of the equipment. The appellate court confirmed that the creditor was a third party beneficiary of the sales agreement. The court rejected the buyers' contention that their default effected a rescission which terminated the contract, along with the creditor's third party rights. First, the court held, termination by way of the buyer's default was not a rescission. Second, the contract provided that in the event of default, the creditor would have a security interest in the repossessed property. "*The default by [the buyers] was the very event which brought this implied term of the contract into operation. Even a formal rescission would not affect that provision.*" (*Mannon, supra,* 59 Cal.App.2d at pp. 608-609, italics added.)

We find *Mannon* and *Pearsall* highly analogous. The firm's lease was not rescinded. There was no attempt by either party to restore the consideration obtained under the lease. (Civ. Code, § 1691, subd. (b).) Instead, the lease was extinguished by operation of law when Principal foreclosed. Much as in *Mannon,* however, the lease contained a provision which was specifically designed to take effect upon its extinguishment by foreclosure: the attornment provision which obligated the firm to enter a new lease with Principal on the same terms as the preexisting lease with the landlord. As discussed *ante,* a contrary holding would violate well-established rules of contract interpretation by rendering the attornment clause meaningless. (Civ. Code, § 1641; *Miscione, supra,* 52 Cal.App.4th at pp. 1329-1330.)[9]

After Principal acquired the property at foreclosure, it was therefore entitled to enforce its rights as a third party beneficiary of the attornment clause and require that the firm enter a new lease on the same terms as the

---

[9]Also, rescission may not be allowed if a third party beneficiary has acted in reliance on the promises made for his benefit. (*Dick* v. *Woolson* (1951) 106 Cal.App.2d 415, 419 [235 P.2d 119].) While there is no evidence that Principal's trust deed was made in reliance on the attornment provision, if that were the case, then rescission could not have occurred.

original lease. The firm's failure to do so and concomitant departure from the premises were a breach of this obligation.

### C. *Other Contract Defenses Are Not Applicable*

██ Appellants also challenge the attornment provision on the following grounds: (1) because it does not specify who is to enforce the provision or the manner in which it shall be invoked, the clause is fatally vague and uncertain; (2) because Principal was free to pick and choose when or whether it invoked the attornment clause, the provision lacked mutuality of obligation and therefore failed for a lack of consideration; and (3) even if the attornment clause were enforceable by Principal, the partners' personal guarantees were not.

Paragraph 31c of the lease states if the property is sold or acquired by foreclosure, the tenant "shall, upon request, attorn to such successor in interest and, upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such successor in interest . . . or at the election of such successor in interest, this Lease shall automatically become a new lease between Tenant and such successor in interest . . . ." This provision is designed to give the new owner the choice whether to have the tenant attorn. While it could have been made more explicit, when viewed in this context it seems clear to us that the landlord's successor in interest would be the party to make that request. Though the provision is silent as to how that request must be made, appellants do not contend that a written request in the form of a letter, as occurred here, is insufficient.

As to the failure to specify a deadline for such a request, a reasonable time will be implied. (Civ. Code, § 1657.) What constitutes a reasonable time presents a question of fact which depends on the circumstances of the particular case. (*Eidsmore* v. *RBB, Inc.* (1994) 25 Cal.App.4th 189, 198 [30 Cal.Rptr.2d 357].) Appellants have not addressed this issue at all and we therefore deem it waived. (*Unilogic, Inc.* v. *Burroughs Corp.* (1992) 10 Cal.App.4th 612, 624 [12 Cal.Rptr.2d 741].)[10]

Next, mutuality of obligation is necessary only in bilateral contracts where there are mutual promises. The doctrine states that the promises on both sides must be binding obligations in order to be consideration for each other. Problems arise in two instances: illusory agreements where no obligation at all is assumed; and where the promise states a definite obligation, but the

---

[10]The better practice, however, would be to set forth a more detailed mechanism and timetable for attornment.

promisor has an election to perform or withdraw at his pleasure. (1 Witkin, Summary of Cal. Law (9th ed. 1987) § 228, pp. 236-237.) Appellants contend the doctrine applies because Principal was free to choose for itself whether to require that the firm attorn. This contention fails to recognize that Principal was a third party beneficiary of the lease between the firm and the landlord, not a party to the lease. A third party beneficiary need not supply any consideration to enforce an agreement made for its benefit. (*Macaulay* v. *Norlander* (1992) 12 Cal.App.4th 1, 8, fn. 3 [15 Cal.Rptr.2d 204].) There is no dispute that the lease was supported by ample consideration, consisting of, among others, the landlord's promise to place the firm in possession of the premises and the firm's promise to pay rent. Where sufficient consideration is present, mutuality is not essential. (*Brawley* v. *Crosby etc. Foundation, Inc.* (1946) 73 Cal.App.2d 103, 113 [166 P.2d 392].)

▮ Finally, the partners' personal guarantee was made an exhibit to the lease and specifically provided that it would apply to the landlord's successors in interest and continue during the term of the lease or any renewals of the lease. It also provided that: the guarantee would not be affected by any modifications, alterations or extensions of the lease; and that the lease provisions could be changed by agreement or course of conduct between the landlord or its successors and the tenants and that the guarantee "shall guarantee the performance of the Lease as changed." We believe this encompassed a new lease on the same terms as the previous one which would result from an attornment. On these facts, we conclude that the partners' personal guarantee of the lease obligations was enforceable by Principal.

## 4. *Freedman Was Not Relieved of Liability*

▮ Freedman contends that he was not liable for the firm's breach of the lease because it was not an act necessary to wind up the affairs of the dissolved partnership or to complete unfinished partnership transactions. (Corp. Code, §§ 15029, 15030, 15033.) Instead, he contends, the firm could only bind him to its breach of the lease under Corporations Code section 15035, which states, in relevant part: "(1) After dissolution a partner can bind the partnership except as provided in paragraph three, [¶] (a) By any act appropriate for winding up partnership affairs or completing transactions unfinished at dissolution; [¶] (b) By any transaction which would bind the partnership if dissolution had not taken place, provided, the other party to the transaction: [¶] I. Had extended credit to the partnership prior to dissolution and had no knowledge or notice of the dissolution; or [¶] II. Though he had not so extended credit, had nevertheless known of the partnership

prior to dissolution, and, having no knowledge or notice of dissolution, the fact of dissolution had not been advertised in a newspaper of general circulation . . . ." Freedman then points to evidence that the landlord knew the original partnership had dissolved after he and Vars left and accepted rent from the successor firms, thus relieving him of further liability under the lease.

This argument must fail because the firm's conduct in breaching the lease is chargeable to Freedman as an act within the scope of winding up the firm's affairs. "In general a dissolution operates only with respect to future transactions; as to everything past the partnership continues until all pre-existing matters are terminated. [Citations.] *The dissolution does not destroy the authority of a partner to act for his former associates in matters in which they still have a common interest and are under a common liability.* [Citations.]" (*Cotten* v. *Perishable Air Conditioners* (1941) 18 Cal.2d 575, 577 [116 P.2d 603, 136 A.L.R. 1068], italics added.) The lease was a partnership obligation which came into being before dissolution and was a matter in which all the partners had a common interest and were under a common liability. Accordingly, Freedman is bound by the firm's breach of the lease.[11]

Finally, Freedman contends that his partners, the landlord and Principal released him from his lease obligations by operation of Corporations Code section 15036, which states, in relevant part: "(1) The dissolution of the partnership does not of itself discharge the existing liability of any partner. [¶] (2) A partner is discharged from any existing liability upon dissolution of the partnership by an agreement to that effect between himself or herself, the partnership creditor and the person or partnership continuing the business; and such agreement may be inferred from the course of dealing between the creditor having knowledge of the dissolution and the person or partnership continuing the business."

While Freedman again points to evidence which he contends shows an agreement to release him from his lease obligations, the evidence on this point was highly conflicting. Freedman testified that at some point after he left the firm, McCord offered to assume his lease obligations in exchange for a $50,000 reduction of the firm's debt to Freedman, an offer which Freedman rejected. This alone is substantial evidence that the firm never agreed to release Freedman from his lease obligations under Corporations Code section 15036, subdivision (2).

---

[11]Our holding does not consider whether the firm's breach was wrongful as to Freedman or Vars, an issue which bears only on the previously dismissed portion of the appeal from the partners' various cross-complaints for indemnity and an accounting.

### 5. *The Lender Could Not Unilaterally Subordinate Its Trust Deed*

One alternative ground for the trial court's judgment was Principal's unilateral recordation of a "subordination agreement" purporting to alter the priority of its trust deed and thereby make it junior to the firm's lease. The priority rights fixed by a subordination agreement are strictly limited by the terms of that agreement. (*Miller* v. *Citizens Sav. & Loan Assn.* (1967) 248 Cal.App.2d 655, 663 [56 Cal.Rptr. 844]; *Bank of America* v. *Hirsch Merc. Co.* (1944) 64 Cal.App.2d 175, 182-183 [148 P.2d 110].) While the lease at issue in *Miscione* contained a provision by which a lender could elect to undo the automatic subordination of a tenant's lease to the lender's trust deed, the lease at issue here did not. Instead, it is silent on that topic. Because the firm's lease provides only that it was automatically subordinated to Principal's trust deed, Principal could not unilaterally reverse those priorities.

### DISPOSITION

For the reasons set forth above, the judgment for Principal is affirmed. Respondent to recover its costs on appeal.

Turner, P. J., and Armstrong, J., concurred.

A petition for a rehearing was denied September 10, 1998, and appellants' petition for review by the Supreme Court was denied November 18, 1998. Kennard, J., was of the opinion that the petition should be granted.