[No. A106347. First Dist., Div. One. Mar. 25, 2005.]

CENTRAL BUILDING, LLC, Plaintiff and Respondent, v.
DON D. COOPER et al., Defendants and Appellants.

1054

Counsel

Ericksen, Arbuthnot, Kilduff, Day & Lindstrom, Lois A. Lindstrom and Gregory A. Mase for Defendants and Appellants.

Rentschler/Tursi, Judith J. Rentschler and Joseph G. Tursi for Plaintiff and Respondent.

## Opinion

**MARCHIANO, P. J.**—This case teaches the maxim of life and law from the Roman philosopher Publius Syrus: "Never promise more than you can perform." Don D. Cooper and Robert H. Cooper appeal from a judgment in an action for breach of contract involving their personal guaranties of payment on a commercial lease. We conclude that the guaranty agreements were continuing guaranties of performance under the lease that applied to the lease amendments. We will affirm the judgment.

### BACKGROUND

Cooper and Cook Insurance Services, Inc. (C&C), a corporation, leased premises from Pleasanton Plaza Associates, L.P. (PPA), the predecessor in interest of Central Building, LLC. C&C was frequently late in making the rent payments.

In September of 1995, C&C and PPA negotiated a lease termination agreement, a new lease for smaller premises at the same rental rate per square foot, and personal guaranty agreements by the individual principal shareholders of C&C. The lease termination agreement also provided for termination of existing personal guaranty agreements.

At the time of signing the new lease, the principals of C&C executed new personal guaranty agreements. The new lease and the lease termination

agreement specifically referenced the personal guaranties as additional consideration for the lease. The guaranty agreements referred to the lease termination agreement and the new lease and provided that the guarantors "jointly, severally, unconditionally and irrevocably guarantee up to the Guaranty Amount (as defined below) the following obligations: (a) The faithful and prompt performance by Lessee of each and every one of the terms, conditions and covenants set forth in the Agreement [referring to the lease termination agreement] to be kept and performed by Lessee; (b) The prompt payment by Lessee of all rentals and other charges payable by Lessee under the New Lease and the faithful and prompt performance by Lessee of each and every one of the terms, conditions and covenants of the New Lease to be kept and performed by Lessee." The guaranty agreements provided for an aggregate limit of $400,000 on the liability of the guarantors. They also provided for decreasing the amount of the guaranty by $4,900 on the last day of each calendar month "[p]rovided that Lessee commences and continues to faithfully and promptly perform each and every one of the terms, conditions and covenants of the Agreement and the New Lease . . . ."

The term of the new lease was from September 1, 1995 to August 31, 2001. The lease stated that the minimum rent payment was due in advance on the first of every month.[1] The stated minimum rent was $20,000 per month for the first 60 months and $15,000 per month for months 61 through 72 of the term.

In June of 2000, Central Building purchased the premises. Antonia Naranjo, Central Building's chief accountant, testified C&C's first late payment was on September 13, 2000. From that date forward C&C's payments were late almost every month. Don Cooper, a defendant in this case and one of the guarantors, reviewed C&C's bank statements and cancelled checks. Based on the records from 1995 to 2000, Cooper testified that no checks arrived at the landlord's office by the due date.[2]

Before the lease term expired, the parties entered into a first amendment to the lease, dated August 15, 2001, effective September 1, 2001. The first amendment expressly stated that it was "incorporated into and made a part of" the prior lease and agreed to amend the lease to extend the term to December 31, 2001. The rent was stated as $15,000 per month. The amendment stated that all other monetary obligations remained the same as the

---

[1] The lease provided for additional rent payments based on prorated shares of specified taxes and other charges.

[2] Cooper testified that checks were mailed to the landlord on the day they were written. Between 1995 and 2000, only five checks were dated the first of the month. All others were dated later. On March 6, 2001, Central Building served a three-day notice to pay rent or quit on C&C, which was apparently resolved between the parties.

initial term of the lease. Finally, the first amendment provided: "Except to the extent modified herein, all terms and conditions of the Lease shall remain unchanged." There was no evidence that the guaranty agreements were terminated or reduced at this time.

After expiration of the extended term C&C remained on the premises from January 1, 2002 to March of 2002, pursuant to the holdover provision of the lease. That provision stated: "If Lessee should remain in possession of the Leased Premises after the expiration of the Term and without executing a new Lease, then, upon acceptance of rent by Lessor, such holding over shall be construed as a tenancy from month-to-month, subject to all the conditions, provisions and obligations of this Lease as existed during the last month of the Term hereof, so far as applicable to a month-to-month tenancy."

On March 22, 2002, the parties executed a second amendment to the lease extending the term from April 1, 2002 to March 31, 2003. The second amendment recited that the initial term expired on or about August 30, 2001, the extended term expired on December 31, 2001, and the parties desired to extend the term of the lease. The second amendment stated that it was incorporated into and made a part of the September 7, 1995 lease and the first amendment dated August 15, 2001. The second amendment provided that except as modified, the original lease terms remained in effect. Don Cooper admitted that the parties intended to extend the term of the original lease. Again, there was no evidence that the guaranty agreements were terminated, reduced, or even discussed.

C&C never paid rent after the date of the second lease amendment.

On December 16, 2002, Central Building filed a complaint for breach of contract against the guarantors. In a first amended complaint, it added C&C as a defendant. On October 15, 2003, apparently as a result of negotiations with Central Building, C&C vacated the premises.[3] C&C admitted that it owed Central Building $278,964.76 as unpaid rent and other fees, but the guarantors denied any liability to Central Building.

The trial took place in December of 2003. On January 22, 2004, the trial court entered judgment against C&C, Don D. Cooper, Ben Fernandez and Robert H. Cooper, jointly and severally, in the amount of $291,929.96 plus costs. The amount awarded appears to be the amount of rent, late fees and

---

[3] C&C's business was sold for $849,000, representing assumption of the obligations of the business, but not including the amounts owed to Central Building.

other charges admittedly owed by C&C, plus interest. Don D. Cooper, Ben Fernandez and Robert H. Cooper appealed.[4]

## DISCUSSION

Defendants argue that the guaranty agreements did not extend beyond the term of the 1995 lease, or into the period of the holdover tenancy, and that they should not be held for C&C's admitted defaults. They also contend that they should have been given credit under the terms of the guaranty for every month that C&C paid rent before the end of the month in which it was due.

■ After reviewing general principles of suretyship and guaranty and the terms of the governing documents, we conclude that the guaranty agreements applied to the lease as amended and that the condition that would have triggered credits under the guaranty agreements did not occur.

*General Principles Applicable to Guaranty Agreements*

■ Civil Code section 2787 provides in relevant part: "A surety or guarantor is one who promises to answer for the debt, default, or miscarriage of another, or hypothecates property as security therefor." We independently review a lease and a guaranty agreement subject to the usual rules of contract interpretation. (*Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman* (1998) 65 Cal.App.4th 1469, 1477–1478 [77 Cal.Rptr.2d 479] (*Principal Mutual Life*); *River Bank America v. Diller* (1995) 38 Cal.App.4th 1400, 1415 [45 Cal.Rptr.2d 790]; Civ. Code, § 2837.) Where the contract language "is clear and explicit," its terms are interpreted without regard to extrinsic evidence. (Civ. Code, §§ 1638, 1639.)

■ When a guaranty agreement incorporates another contract, the two documents are read together and " '[c]onstrued fairly and reasonably as a whole according to the intention of the parties.' [Citations.]" (*Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 39–40 [86 Cal.Rptr.2d 855, 980 P.2d 407].) In other words, when a party undertakes to guarantee the faithful performance of another contract, the guarantor is contracting in reference to the other contract; " ' "otherwise it would not know what obligation it was assuming." ' " (*Boys Club of San Fernando Valley, Inc. v. Fidelity & Deposit Co.* (1992) 6 Cal.App.4th 1266, 1271–1272 [8 Cal.Rptr.2d 587].)

---

[4] Ben Fernandez subsequently petitioned for chapter 13 bankruptcy. The petition, which is still pending, stayed Fernandez's appeal. (11 U.S.C. § 362; see *Ingersoll-Rand Financial Corp. v. Miller Min. Co.* (9th Cir. 1987) 817 F.2d 1424, 1426–1427 [automatic stay limited to debtors and does not include nonbankrupt codefendants].) Robert Foster, also named as a defendant in the complaint, was deceased at the time of trial. No answer had been filed on his behalf and plaintiff dismissed the action as to Foster. We decide only the appeals of Don D. Cooper and Robert H. Cooper in this opinion.

Keeping these principles and facts in mind, we address defendants' arguments regarding enforceability of the guaranty agreements in this case.

*Enforceability of the Guaranty Beyond the Term of the 1995 Lease*

Guarantor defendants argue that the personal guaranty agreements expired at the end of the 72-month term of the 1995 lease and the lease contained no provision for renewal or extension. Alternatively, they contend that even if the first amendment extended the term of the lease, it did not refer to the guaranty and did not extend its term. Finally, they contend that the second amendment could not have extended the guaranty because the guaranty did not survive the month-to-month holdover period, which should be considered a new and distinct tenancy. Central Building contends that the agreement was a continuing guaranty, applicable to future transactions, which remained in effect. We agree with Central Building for the following reasons.

■ Guaranty agreements may be limited or continuing. "A guaranty relating to a future liability of the principal, under successive transactions, which either continue his liability or from time to time renew it after it has been satisfied, is called a continuing guaranty." (Civ. Code, § 2814.) "A continuing guaranty is a contract pursuant to which a person agrees to be a secondary obligor for all future obligations of the principal obligor to the obligee." (Rest.3d Suretyship and Guaranty, § 16.)

■ The guaranty of payment of a tenant's present and future rent liability is an example of a continuing guaranty. (See, e.g., Office Leasing (Cont.Ed.Bar 2004) Guaranty of Lease, §§ 46.9, 46.24, pp. 1108, 1115–1117.) The guaranty agreement in this case applied to present and future obligations under the lease, and was a continuing guaranty, as specifically stated in paragraph 5 of the agreement.

■ Although in general a continuing guaranty may be revoked at any time (Civ. Code, § 2815), the guaranty in this case was expressly made irrevocable and had no expiration date.[5] The guarantors waived a number of statutory defenses, including the revocation provisions of Civil Code section 2815. A guarantor may validly waive rights and defenses in the guaranty contract. (Rest.3d Suretyship and Guaranty, § 48, pp. 208–209.) In addition to waving the statutory revocation provisions, the guaranty agreements provided for termination only by an agreement in writing by the lessor and lessee to terminate the lease and release all obligations of the guarantors.

---

[5] Civil Code section 2815 provides: "A continuing guaranty may be revoked at any time by the guarantor, in respect to future transactions, unless there is a continuing consideration as to such transactions which he does not renounce."

In contrast to a continuing guaranty, the example of a limited guaranty in the above referenced California Continuing Education of the Bar publication provides, in part: "At the expiration of the Guaranty Period, the obligations of Guarantor under this Guaranty shall automatically terminate." The "guaranty period" is specifically defined as the starting and ending date of the lease. (Office Leasing, *supra*, § 46.23, pp. 1114–1115.) No similar limiting language is present in the guaranty agreements in this case. Such language would have conflicted with the express terms of the agreements.

Ignoring the lack of limitation in the guaranty, defendants argue that there is no specific language in the guaranty or the lease that makes the guaranty applicable to extensions of the lease term. They refer to *Principal Mutual Life, supra,* 65 Cal.App.4th 1469 as an illustration of the language necessary to create a guaranty that expressly applies to renewals and extensions of a lease. Although the main issue in *Principal Mutual Life* concerned the effect of an attornment clause, that court also found that the guaranty agreement in that case provided that it continued during any renewals of the lease. (*Id.* at p. 1489.) The language quoted from the contract in that case provided that the guaranty would not be affected by "modifications, alterations or extensions of the lease" and that the guaranty applied to performance of "the [l]ease as changed." (*Ibid.*) But inclusion of the word "extensions" is not necessary to express an agreement that a continuing guaranty will apply to changes in the underlying agreement.[6]

The lease in this case contains clear language allowing modification by an agreement in writing. In addition, the guaranty agreements in this case provided that: "It is specifically agreed and understood that the terms of the foregoing [lease termination agreement] and New Lease may be *altered, affected, modified or changed by agreement between Lessor and Lessee or by a course of conduct* . . . without consent or notice to Guarantors and that this Guaranty shall thereupon and thereafter guarantee the Performance as so changed, modified, altered or assigned."[7] The language in the relevant documents plainly makes the guaranty applicable to modifications in the lease such as extensions of the lease term. Moreover, in paragraph 10(b) of the agreements, the guarantors expressly waived their statutory right under Civil Code section 2819, to exoneration when the original obligation is altered.[8]

[6] *Principal Mutual Life* found the personal guaranty was continuing, in construing language similar to the guaranty in this case (*Principal Mutual Life, supra,* 65 Cal.App.4th 1469, 1489).

[7] "Performance" was a defined term that included "faithful and prompt performance" of every term of the lease termination agreement and "prompt payment" of all rentals due and "faithful and prompt performance" of every term in the new lease.

[8] *Civil Code section 2819* provides in relevant part: "A surety is exonerated . . . if by any act of the creditor, without the consent of the surety the original obligation of the principal is altered in any respect . . . ." (*Pearl v. General Motors Acceptance Corp.* (1993) 13 Cal.App.4th 1023,

■ Even without the express term in the guaranty allowing modification, a modification of the underlying obligation generally does not revoke a continuing guaranty, but only modifies the guaranty in the same way that the underlying obligation is modified. (Rest.3d Suretyship and Guaranty, § 41, pp. 184–185.) The guarantor is only discharged if the modification (other than an extension of time) "creates a substituted contract or imposes risks on the secondary obligor fundamentally different from those imposed pursuant to the transaction prior to modification." (*Ibid.*) The Restatement explains that a "substituted contract" is a new contract that discharges or satisfies the original duty and therefore discharges the guarantor. (Rest.3d Suretyship and Guaranty, § 41, com. e, p. 187.) In this case, the only substituted contracts were the new lease and lease termination agreement. The lease termination agreement expressly terminated the prior personal guaranty agreements. This action demonstrates that the parties knew how to terminate a personal guaranty when that was their intent.

■ Defendants rely on a number of inapplicable cases, discussed below, to argue that once the extended lease term expired and they remained on the premises as holdover tenants, the guaranty ceased to apply. They focus on the general rights of parties during a holdover period, without considering the fact that the guaranty in this case was intended to secure the ongoing obligations of the primary obligor, despite changes in the lease by agreement or a subsequent course of conduct. Parties to a commercial transaction are free to structure their relationship in a different way than the general law would require. (Rest.3d Suretyship and Guaranty, § 6, com. a, p. 29.) In this case, the parties did not leave their relationship to the general law of holdover tenancies, but provided that the guaranty applied to changes in the lease made by agreement and by course of conduct.[9]

Defendants cite *Burroughs v. Ben's Auto Park, Inc.* (1945) 27 Cal.2d 449 [164 P.2d 897], for the proposition that a holdover period is a new tenancy that does not carry over provisions of the lease. But *Burroughs* was a tort case that did not involve a holdover tenant. The issue in *Burroughs*

---

1029 [16 Cal.Rptr.2d 805] [noting cases allowing waiver of section 2819]; see also *Data Sales Co., Inc. v. Diamond Z Mfg.* (Ariz.Ct.App. 2003) 205 Ariz. 594 [74 P.3d 268, 272, fn. 4] [collecting cases holding that a change in the primary obligation does not discharge a guarantor who has agreed expressly or by implication to the change]; and *ITT Diversified Credit Corp. v. Highlands Ins. Co.* (1987) 191 Cal.App.3d 301, 308 [236 Cal.Rptr. 433] [section 2819 only applies to a material alteration of the obligation "in a manner not [originally] contemplated by the surety"].) Extension of a commercial lease for an additional term is not a material alteration that would not be contemplated by businesspersons.)

[9] Civil Code section 1945 sets out the relationship of a holdover tenant to the landlord: "If a lessee of real property remains in possession thereof after the expiration of the hiring, and the lessor accepts rent from him, the parties are presumed to have renewed the hiring on the same terms and for the same time, not exceeding one month when the rent is payable monthly, nor in any case one year."

was whether an express agreement to extend the tenancy on a month[-]to-month basis at a different rent deprived the lessor of the right of reentry to inspect for dangerous conditions. The court distinguished a lease renewal as creating a new tenancy, while an extension is the " 'stretching or spreading out' of a former term [citations]." (*Id.* at p. 454.) Regardless of the distinction, the court stated it was immaterial in that case to determine whether a new tenancy was created or an old one was extended. (*Ibid.*) *Burroughs* does not apply to this case.

Defendants cite *Spaulding v. Yovino-Young* (1947) 30 Cal.2d 138 [180 P.2d 691], in support of the argument that the guaranty did not extend beyond the initial term of the lease, regardless of language in the holdover provision applying the terms of the lease to any holdover period. The court in *Spaulding* found that the language of a lease implied a correlation between a purchase option and the two-year lease term, so that the option expired at the end of the lease term, even though the tenant remained on the premises. (*Id.* at p. 142.) Defendants can point to no language in the 1995 lease indicating an intent to release the guarantors in the event of an extension of the lease term. To the contrary, the language of the documents in this case disclose an intent that the promise of the guarantors would continue.

*Union Oil Co. v. Moesch* (1979) 88 Cal.App.3d 72, 78 [151 Cal.Rptr. 517], cited for the proposition that a month-to-month holdover is a new arrangement rather than a continuation of the lease is also inapplicable. The case involved a gasoline franchise lease that stated it would terminate automatically on a date specified in the lease. (*Id.* at p. 77.) No amendment or new lease was entered into in *Union Oil.* The tenant in that case merely remained on a month-to-month basis until the landlord terminated the tenancy. (*Id.* at p. 74.) The issue was whether the court could apply a new statute to the tenancy without impairing a contractual right. (*Id.* at pp. 76–77.) *Dover Mobile Estates v. Fiber Form Products, Inc.* (1990) 220 Cal.App.3d 1494 [270 Cal.Rptr. 183] is similarly inapposite. In that case, a foreclosure sale extinguished the lease and the tenant continued on a month-to-month basis. No amendment or extension of the lease was involved.

The statutory rights governing a holding over period did not result in continuation of the provisions of the contracts in this case. The outcome is determined by the continuing nature of the guaranty and the express agreement of the parties. Contrary to defendants' argument, it makes no difference whether or not the lease contained an option to extend it. Modification or changes to the lease were expressly allowed and the guaranty "shall thereupon and thereafter guarantee the Performance as so changed, modified, altered or assigned." The language in the guaranty expresses the intent to apply the guaranty to continuations or extensions of the lease, whether by

formal agreement or by a course of conduct such as holding over. The plain terms of the documents extended the obligations of the guarantors to future modifications of the lease.

*Credit Against Guaranty Limit for Late Rent Payments*

Defendants argue that they are entitled to credit under the terms of the guaranty for every month that C&C paid rent before the end of the month. They rely on the paragraph in the guaranty that states: "Provided that Lessee commences and continues to faithfully and promptly perform each and every one of the terms, conditions and covenants of the Agreement and the New Lease, the Guaranty Amount *shall be reduced on the last day of each calendar month* of the Term of the New Lease . . . by an amount equal to Four Thousand Nine Hundred Dollars ($4,900)." Defendants contend that the guaranty does not define what constitutes "prompt" payment of the rent, and that it means payment at any time within the month in which the rent was first due.

Defendants contend that the trial court found the guaranty was unclear and allowed extrinsic evidence on the issue of whether payment by the end of the month entitled the guarantors to a credit. In fact, the court stated that it was not clear whether a single late payment would stop the accruing of any credits, and allowed extrinsic evidence on that issue. The evidence produced was Don Cooper's testimony that he understood that if the rent was paid in the month it was due, the guarantors were entitled to a credit.[10] On cross-examination, Cooper admitted the guaranty did not reference a 72-month duration. He interpreted the language stating that the guaranty amount shall be reduced on the last day of the month as stating that so long as rent was paid by the last day, the credit would be given. He admitted that the lease did not provide that rent could be paid at any time during the month.

Central Building moved to strike all testimony regarding waiver, reduction of the guaranty for payments made by the end of the month, and testimony indicating that there were understandings between the parties to the lease that were not expressed in the written document. The court took the motion under submission and stated that if the motion were granted, the court would disregard the challenged testimony. In light of the court's judgment in favor of Central Building, and the fact that a party's subjective belief in the meaning of a contract is irrelevant, particularly when the contract is an

---

[10] Cooper also testified to his understanding that the guaranty was for a specific period of time and expired after 72 months, despite the lack of any provision limiting the time that the guaranty remained in effect. Contrary to defendant's suggestion that Cooper's testimony is somehow binding, the trial court was free to disregard any evidence that controverted the terms of the agreements.

integrated agreement, it is reasonable to assume the court rejected the inconsistent testimony on which defendants rely. (*Sunniland Fruit, Inc. v. Verni* (1991) 233 Cal.App.3d 892, 898 [284 Cal.Rptr. 824] [party's subjective intent "cannot be used to establish an intent independent from the express written terms of the agreement"].)

The terms of the lease expressly provide that rent is due in advance on the first day of each month. The section of the lease defining default provides that failure to pay the rent *when due* is a default. Failure to perform other provisions is a default only when the failure continues for 10 days. To avoid default, the lessee was required to pay the rent when due, not within a month, or even within 10 days.

To accept Cooper's interpretation of the agreements would require a finding that C&C could be in default throughout the tenancy, but would still have faithfully and promptly performed for purposes of the guaranty. The plain language of these well-drafted agreements is not susceptible to this construction.

The language of the guaranty agreements in this case unmistakably establishes that the guaranty reduction is conditioned on the circumstance that the lessee "commences and continues to faithfully and promptly perform each and every one of the terms" of the lease. This language is clear. It does not state that the guaranty will be reduced if the lessee substantially performs, or pays rent within a month of the due date. Rather, it states that time is of the essence and that performance must be continuing, faithful and prompt. Failure to pay when due constitutes neither faithful nor prompt performance and in the absence of such performance, the guaranty reduction provision was not triggered.

The intent of the parties, based on the words of the governing contracts, was that payment of rent when due would entitle the guarantors to a reduction in the guaranty cap. The rent was not paid when due, and no reduction was made. The evidence supports the judgment.[11]

---

[11] Although defendants pled waiver as a defense in their answer, the only arguments raised at trial regarding waiver related to the impact of failed settlement talks and an offer to lease the premises to the purchaser of C&C's business. Defendants have not argued that Central Building waived its right to refuse to reduce the guaranty cap by accepting payments. The lease and the guaranty agreements both contained clauses stating that acceptance of rent or delay in enforcing rights was not a waiver of any provision of the contract. In addition, we note that the guarantors themselves never raised the issue of a possible reduction in the guaranty amount until after this action was filed.

## CONCLUSION

The judgment is affirmed.

Stein, J., and Swager, J., concurred.