Filed 4/22/26  Unit 5 v. J.T. McKinney Co. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| UNIT 5, L.P., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> J.T. MCKINNEY CO., INC., <br><br> Defendant and Appellant. | D085422, D086455 <br><br><br> (Super. Ct. No. 37-2024-00009722-CU-UD-CTL) |

CONSOLIDATED APPEALS from a judgment and a postjudgment order of the Superior Court of San Diego County, Michael T. Smyth, Judge. Reversed and remanded.

Bradley L. Jacobs for Plaintiff and Appellant.

Klein & Wilson, Mark B. Wilson, and Manoah S. Marton for Defendant and Respondent.


I

INTRODUCTION

Unit 5, L.P. (Unit 5) leased a parcel of commercial property to J.T. McKinney Co., Inc. (McKinney), and provided McKinney an option to

renew the lease for five years beyond the original term. The option was subject to a condition precedent requiring McKinney to be in full possession of the leased premises. Near the end of the lease term, McKinney attempted to exercise the option. However, Unit 5 rejected the attempted exercise of the option on the basis that McKinney had subleased a portion of the premises to another entity, divesting McKinney of full possession of the premises.

McKinney remained on the premises after the end of the original lease term and Unit 5 filed an unlawful detainer action against McKinney. After a one-day bench trial, the trial court found the sublease deprived McKinney of full possession of the premises. However, the court found the lease required Unit 5 to provide McKinney with notice and an opportunity to cure its failure to satisfy the full possession condition. Because Unit 5 did not give McKinney notice and an opportunity to cure before it rejected McKinney's exercise of the option, the court ruled the exercise of the option was effective and McKinney was entitled to continued possession of the premises.

Unit 5 appealed the judgment in favor of McKinney, and McKinney cross-appealed,. Unit 5 also appealed a postjudgment order awarding costs to McKinney as the prevailing party in the unlawful detainer case. In its appeal, Unit 5 argues the trial court misapplied the parol evidence rule by excluding extrinsic evidence probative of the parties' understanding of the lease and related lease documents, the court erred in finding McKinney was entitled to notice and an opportunity to cure its failure to satisfy the full possession condition, and the court improperly ruled on McKinney's affirmative defenses, which the parties had reserved for a separate phase of trial to be tried before an empaneled jury. McKinney contests these arguments and claims in its cross-appeal that the parties nullified or

2

superseded the full possession condition by amending the lease, and at any rate, its sublease did not deprive it of full possession of the premises.

We agree with Unit 5 that the trial court erred in finding that the lease required Unit 5 to provide McKinney with notice and an opportunity to cure its failure to satisfy the option condition requiring full possession of the premises. We also reject the arguments McKinney asserts in its cross-appeal. Therefore, we reverse the judgment and remand the matter for further proceedings on McKinney's affirmative defenses. Because we reverse the judgment, we also reverse the postjudgment order awarding costs to McKinney.

## II

## BACKGROUND

### A. *The Lease*

Unit 5 owns a 10.3-acre parcel of land in the Otay Mesa community of San Diego near the U.S.-Mexico border. McKinney is a semi-trailer leasing company that leases approximately 40,000 trailers nationwide.

In March 2017, Unit 5, as lessor, and McKinney, as lessee, executed an AIR Commercial Real Estate Association Standard Commercial Single-Tenant Lease for 4.3 acres of Unit 5's property for a term of three years. Although the parties executed a standard form lease, consisting of Paragraphs 1 through 50, they modified certain provisions in the lease and interlineated new language into the lease. They also drafted and executed a lease addendum, consisting of Paragraphs 51 through 59, which was incorporated into the lease.

Four paragraphs and subparagraphs from the lease and its addendum are pertinent to this appeal:

3

- Paragraph 12 and its subparagraphs govern subleases and assignments of McKinney's lease interests. In its original form, Paragraph 12.1(a) required McKinney to obtain permission from Unit 5 before *assigning* its lease interests, but not before entering *subleases*. The initial version of Paragraph 12.1(a) stated, "[McKinney] shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, 'assign or assignment') ~~or sublet~~ all or any part of [McKinney]'s interest in this Lease or in the Premises without [Unit 5]'s prior written consent."[1] (Strikethrough in original.)

- Paragraph 13.1 describes the circumstances of a default and/or breach of the lease. It defines a default as "a failure by [McKinney] to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under th[e] Lease." Then, it defines a breach as "the occurrence of one or more" specifically enumerated types of defaults, "and the failure of [McKinney] to cure such [d]efault within any applicable grace period ...." Relevant here, Paragraph 13.1(e) is a catch-all provision granting McKinney the right to notice and a 30-day window to correct most types of defaults before they mature into a breach. It states that a breach includes any "Default by [McKinney] as to the terms, covenants, conditions or provisions of [the] Lease ... other than those" enumerated elsewhere in Paragraph 13.1, "where such Default continues for a period of 30 days after written notice" from Unit 5.

---

[1] Paragraph 12.3 sets forth various rules and conditions governing subleases.

- Paragraph 39 and its subparagraphs set forth the parameters of any options that Unit 5 might grant McKinney.[2]  Paragraphs 39 and 39.2 state, "39. ... If [McKinney] is granted any Option ... then the following provisions shall apply: ... [¶] 39.2 ... Any Option granted to [McKinney] in th[e] Lease is personal to [McKinney], and cannot be assigned or exercised by anyone other than said [McKinney] *and only while [McKinney] is in full possession of the Premises* and, if requested by [Unit 5], with [McKinney] certifying that [McKinney] has no intention of thereafter assigning or subletting."  (Italics added.)

- Paragraph 57 of the lease addendum grants McKinney an option to renew the lease for five years beyond the initial lease term.  In its original form, Paragraph 57 stated, "Provided [McKinney] is not in Default of the Lease, [McKinney] shall have one (1) five (5) year option to renew the Lease, subject to providing [Unit 5] with a written notice of [McKinney's] intent to exercise said option.  Said notice must be received by [Unit 5] at least one-hundred twenty (120) days prior to the then expiring Lease Term."

B. *The Lease Amendments*

Between 2018 and 2020, the parties executed four sets of amendments to the lease.  Those amendments extended the acreage of the leased premises from 4.3 acres to 7.3 acres, and then to 10.3 acres.  They also extended the lease term through December 31, 2023.  Two amendments, both adopted in

---

[2]    Paragraph 39.1 defines an option as "(a) the right to extend or reduce the term of or renew th[e] Lease or to extend or reduce the term of or renew any lease [McKinney] has on other property of [Unit 5]; (b) the right of first refusal or first offer to lease either the Premises or other property of [Unit 5]; (c) the right to purchase, the right of first offer to purchase or the right of first refusal to purchase the Premises or other property of [Unit 5]."

2018 as part of the second set of lease amendments, are pertinent to the current appeal.[3]

One of the amendments, contained in Paragraph 9, states in relevant part, "Provided [McKinney] is not in Default of the Lease *beyond any applicable notice and cure period*, [McKinney] shall have one (1), five (5) year Option to renew the Lease, subject to providing [Unit 5] with a written notice of [McKinney's] intent to exercise said Option. Said notice must be received by [Unit 5] at least *one-hundred eighty* (*180*) *days* prior to the then expiring Lease Term." (Italics added.)

The other amendment, contained in Paragraph 15, requires McKinney to obtain Unit 5's permission before entering a sublease, just as it is required to do before assigning its lease interests. Paragraph 15 states, "[McKinney] shall not assign this Lease or sublet the whole or any part of the Combined Premises without the prior written consent of [Unit 5]."

C. *The Charger Sublease and DLR License Agreement*

In March 2023, McKinney entered a sublease with Charger Logistics USA, Inc. (Charger), a Canadian transport company, for 4.3 acres of the leased premises. The sublease extends from April 1, 2023, through December 31, 2028. McKinney did not provide a copy of the sublease to Unit 5, but a representative from Unit 5 nonetheless approved the sublease at McKinney's request.

A few months later, McKinney executed an agreement with DLR Autotransportes, LLC (DLR), which allowed DLR to park and store trailers and other vehicles on three acres of the leased premises. The agreement is

---

[3] The second set of lease amendments consisted of fifteen amendments addressing a variety of issues such as lighting, rent, security deposits, broker commissions, and confidentiality guarantees, among other topics. Only one amendment (Paragraph 9) concerned options.

designated as a "Parking License Agreement." McKinney did not seek or obtain approval from Unit 5 before it executed the DLR agreement.

D. *McKinney's Exercise of the Option*

The final day McKinney could exercise its option to renew the lease was July 4, 2023 (180 days prior to the lease's then-current expiration date of December 31, 2023). Five days before that deadline, McKinney sent Unit 5 a letter purporting to exercise the option to renew the lease for five additional years, until December 31, 2028.

On July 19, 2023, Unit 5 sent McKinney a letter rejecting its attempted exercise of the option and declaring the option null and void on the basis that McKinney was not in full possession of the leased premises pursuant to Paragraph 39.2 of the lease. As we will discuss, Unit 5 maintained that McKinney was not in full possession of the premises due to the Charger sublease and the DLR license agreement.

E. *The Lawsuits*

In September 2023, prior to the expiration of the lease, Unit 5 filed a civil lawsuit against McKinney, San Diego Superior Court Case No. 37-2023-00042586-CU-BC-CTL. The operative complaint alleged McKinney breached the lease by allowing unauthorized trailers and facilities on the property, subleasing a portion of the property beyond the expiration date of the lease, and improperly exercising the lease renewal option. It also alleged McKinney

7

made fraudulent statements to Unit 5 and concealed material facts from Unit 5 when it obtained Unit 5's permission for the Charger sublease.[4]

When McKinney failed to vacate the property after the lease term expired on December 31, 2023, Unit 5 filed the present unlawful detainer action against McKinney. Unit 5 alleged McKinney became a holdover tenant after December 31, 2023, because its attempted exercise of the lease renewal option was ineffective. Unit 5 prayed for restitution of its property, forfeiture of the lease, damages for the reasonable rental value of the property during the putative holdover period, costs, and attorney's fees. McKinney answered the unlawful detainer complaint and asserted 15 affirmative defenses.

The two cases were consolidated for discovery purposes only, and the parties stipulated to a bifurcated trial in the unlawful detainer action. For the first phase of trial, the stipulation called for the trial court to interpret the lease, the lease addendum, and the lease amendments, and to admit a limited scope of documentary evidence. If the court were to adopt Unit 5's interpretation of the lease, the lease addendum, and the lease amendments during the first phase of trial, a jury would be empaneled to rule on McKinney's affirmative defenses during the second phase of trial.

The trial court conducted the first phase of trial on August 5, 2024. It admitted into evidence the lease, the lease addendum, the lease amendments,

---

[4] In Case No. D085422 (the appeal from the unlawful detainer judgment), Unit 5 requested judicial notice of its complaint and McKinney's answer from the civil lawsuit. In Case No. D086455 (the appeal from the postjudgment cost order), Unit 5 requested judicial notice of various additional court filings from the civil lawsuit. We grant Unit 5's request as to the civil lawsuit complaint. (Evid. Code, § 452, subd. (d).) However, we deny the remainder of Unit 5's requests, as the court filings at issue are unnecessary to the disposition of the present appeals.

McKinney's letter to Unit 5 exercising the option, the Charger sublease, the DLR license agreement, written discovery requests from McKinney, and Unit 5's responses thereto. Invoking the parol evidence rule, the court declined to consider extrinsic evidence proffered by Unit 5 concerning the interpretation of the lease, the lease addendum, and the lease amendments.

During the phase one bench trial, Unit 5 argued that Paragraph 39.2 included a condition precedent requiring McKinney to be in full possession of the premises to exercise the option; McKinney was not in full possession of the premises due to the Charger sublease and the DLR agreement; and Unit 5 properly rejected McKinney's exercise of the option based on its failure to satisfy the full possession condition. Meanwhile, McKinney maintained that the second set of lease amendments superseded and/or nullified Paragraph 39.2 of the lease, including the full possession condition; the Charger sublease and the DLR agreement did not divest McKinney of full possession; and, even if the full possession condition was operative and McKinney was not in full possession, Unit 5 could not reject McKinney's exercise of the option because Unit 5 did not provide McKinney with notice and an opportunity to cure its failure to satisfy the full possession condition.

F. *The Statement of Decision*

At the conclusion of the phase one bench trial, the trial court issued a proposed statement of decision, and both parties filed objections. The court then issued its final statement of decision, which concluded that McKinney's exercise of the option was valid and McKinney was entitled to continued possession of the property.

Initially, the court rejected McKinney's argument that the second set of lease amendments superseded and/or nullified Paragraph 39.2 of the lease, including the full possession condition contained therein. Stated differently,

9

the court found that Paragraph 39.2 of the lease and its full possession condition were effective when McKinney exercised the option. The court also found the full possession condition required McKinney to occupy the leased premises when it exercised the option, and the Charger sublease divested McKinney of full possession.[5]

However, the court found McKinney's failure to satisfy the full possession condition constituted a breach of the lease because Paragraph 13.1 of the lease defines a default as any "failure by [McKinney] to comply with or perform any of the ... *conditions*" of the lease. (Italics added). After finding that McKinney breached the lease by not satisfying the full possession condition, the court found Unit 5 could not reject McKinney's exercise of the option because: (1) Paragraph 9 of the second set of lease amendments grants McKinney an option to renew the lease, "[p]rovided [McKinney] is not in Default of the Lease *beyond any applicable notice and cure period*," italics added; (2) Paragraph 13.1(e) of the lease requires Unit 5 to give McKinney notice of any default and an opportunity to cure; and (3) Unit 5 rejected McKinney's exercise of the option without providing McKinney notice and an opportunity to cure its default. Finally, the court found McKinney satisfied all other conditions precedent to exercise the option; therefore, McKinney's exercise of the option was valid.

The trial court entered judgment for McKinney. Unit 5 appealed, and McKinney cross-appealed, from the judgment. Unit 5 also appealed a postjudgment order awarding McKinney $60,737.31 in costs as the prevailing party in the unlawful detainer action (Code Civ. Proc., § 1032 et seq.).

---

[5] Separately, the court rejected Unit 5's assertion that McKinney's license agreement with DLR constituted an unauthorized sublease that deprived McKinney of full possession of the leased premises.

# III

## DISCUSSION

A. *Parol Evidence*

Before we determine whether the trial court properly interpreted the lease agreement, the lease addendum, and the lease amendments, we address whether the court misapplied the parol evidence rule by declining to consider the extrinsic evidence proffered by Unit 5. Unit 5 acknowledges the lease contains an integration clause, but argues the integration clause did not preclude the introduction of the extrinsic evidence at issue.[6]

The parol evidence rule " 'generally prohibits the introduction of any extrinsic evidence, whether oral or written, to vary, alter or add to the terms of an integrated written instrument.' [Citation.] The rule does not, however, prohibit the introduction of extrinsic evidence 'to explain the meaning of a written contract ... [if] the meaning urged is one to which the written contract terms are reasonably susceptible.' " (*Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 343.) "Although the parol evidence rule results in the exclusion of evidence, it is not a rule of evidence but one of substantive law. [Citation.] It is founded on the principle that when the parties put all the terms of their agreement in writing, the writing itself becomes the agreement. The written terms supersede statements made during the negotiations. Extrinsic evidence of the agreement's terms is thus *irrelevant*, and cannot be relied upon." (*Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1174.)

---

6     An integration clause is "[a] contractual provision stating that the contract represents the parties' complete and final agreement and supersedes all informal understandings and oral agreements relating to the subject matter of the contract." (Black's Law Dict. (12th ed. 2024).)

" ' "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." ' [Citations.] 'When the language used in an agreement is fairly susceptible of two or more constructions, extrinsic evidence may be considered, not to vary or modify the terms of the agreement but to aid the court in ascertaining the true intent of the parties.' [Citation.] Thus, '[a] court may provisionally receive such evidence until it is "in a position to determine whether in the light of all of the offered evidence, the item objected to will turn out to be admissible as tending to prove a meaning of which the language of the instrument is reasonably susceptible or inadmissible as tending to prove a meaning of which the language is not reasonably susceptible." ' [Citation.] Extrinsic evidence is admissible only to the extent it is relevant 'to prove a meaning of which the language of the policy is reasonably susceptible.' " (*Montrose Chemical Corp. of Cal. v. Superior Court* (2025) 114 Cal.App.5th 889, 901–902, review granted Dec. 30, 2025, S293914.)

In its appellate briefing, Unit 5 does not describe the extrinsic evidence it proffered in the proceedings below—not even in the broadest of terms. Unit 5 does not present any reasoned arguments about *how* its unidentified extrinsic evidence would have tended to prove the meanings of specific provisions from the lease, the lease addendum, or the lease amendments. Nor does Unit 5 provide a cogent argument that it was prejudiced by the court's parol evidence ruling. (See Cal. Const., art. VI, § 13 [judgment will not be set aside due to trial error unless it "resulted in a miscarriage of justice"]; *Wagner v. Glendale Adventist Medical Center* (1989) 216 Cal.App.3d

12

1379, 1394 [absent a showing of prejudice, "any error in applying the parol evidence doctrine does not warrant reversal of the judgment"].)

In short, Unit 5's parol evidence argument is incomplete and conclusory.[7]  Therefore, we conclude Unit 5 has forfeited its claim that the court erred by failing to consider its extrinsic evidence.  (See *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 146 [" 'In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.' "].)

B. *Construction of the Lease Documents*

We turn now to the central issue of whether the trial court correctly interpreted the lease, the lease addendum, and the second set of lease amendments.  The court found that Paragraph 39.2 of the lease (including its full possession condition) was operative when McKinney exercised the option because the second set of lease amendments did not supersede and/or nullify Paragraph 39.2.  Then, the court found the Charger sublease deprived McKinney of full possession of the leased premises.  Finally, the court found that Paragraph 13.1(e) of the lease and Paragraph 9 of the second set of lease amendments required Unit 5 to provide McKinney with notice and an opportunity to cure its failure to satisfy the full possession condition.  For reasons we shall explain, we agree with the court's first two conclusions, but we disagree with its third conclusion.

---

[7]     Unit 5's parol evidence argument reads, in its entirety, as follows:  "If the trial court had considered [the extrinsic] evidence, it would have understood ... McKinney remaining in full possession of the Property was not a requirement of the Lease, ... its failure to maintain full possession was ... not a breach of the Lease requiring default notice. ... [and] the concept of breach/default is completely unrelated to McKinney's failure to satisfy a condition precedent to the exercise of the Option."

1. *Legal Principles*

"A lease agreement establishing a landlord-tenant relationship is a contract and is subject to the general rules governing the formation and interpretation of contracts." (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1268.) "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties at the time of contract formation. [Citation.] 'We ascertain that intention solely from the written contract if possible, but also consider the circumstances under which the contract was made and the matter to which it relates. [Citations.] We consider the contract as a whole and interpret the language in context, rather than interpret a provision in isolation. [Citation.] We interpret words in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage. [Citation.] If contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs.' " (*Ford v. The Silver F, Inc.* (2025) 110 Cal.App.5th 553, 565–566 (*Ford*).)

" 'When an instrument is susceptible to two interpretations, the court should give the construction that will make the instrument lawful, operative, definite, reasonable and capable of being carried into effect and avoid an interpretation which will make the instrument extraordinary, harsh, unjust, inequitable or which would result in absurdity.' " (*Canyon Vineyard Estates I, LLC v. DeJoria* (2022) 78 Cal.App.5th 995, 1003; see Civ. Code., § 1643.)

We review questions of contract interpretation de novo. (*Sandoval-Ryan v. Oleander-Holdings, LLC* (2020) 58 Cal.App.5th 217, 222.)

2. *Application*

    a. *The Lease Amendments Did Not Supersede or Nullify Paragraph 39.2*

We begin by addressing whether the second set of lease amendments superseded and/or nullified Paragraph 39.2 of the lease—i.e., whether Paragraph 39.2 and its full possession condition were operative when McKinney attempted to exercise the lease renewal option.

In its cross-appeal, McKinney argues the lease amendments superseded and/or nullified Paragraph 39.2 because they both address a particular issue (the issue of whether McKinney can assign its option) in different ways, and a generally applicable provision contained within the lease amendments states that the amendments "control" insofar as there are inconsistencies between the lease and the amendments. Specifically, Paragraph 39.2 provides that any option is personal to McKinney and cannot be assigned or exercised by anyone other than McKinney. However, a general provision from the lease amendments states that the "covenants, terms, agreements and obligations of th[e] ... [l]ease [a]mendment[s] shall extend to and bind and inure to the benefit of the ... assigns of the parties," and one lease amendment (Paragraph 9) amends the five-year lease renewal option that Unit 5 granted to McKinney. According to McKinney, this apparent conflict between Paragraph 39.2 and the lease amendments concerning the assignability of the option shows that the parties intended the

15

amendments to nullify or supersede Paragraph 39.2 in its entirety, including the full possession condition therein.[8]

Like the trial court, we reject McKinney's strained interpretation of the lease amendments. The lease amendments do not state that they supersede or nullify Paragraph 39.2 in its entirety, nor do they state that they supersede or nullify the condition in Paragraph 39.2 requiring McKinney to be in full possession of the leased premises to exercise the option. In fact, the lease amendments do not reference Paragraph 39.2 at all. That omission is revealing, as the lease amendments use express language to delete and replace *other* lease provisions that are unrelated to Paragraph 39.2.

Specifically, Paragraph 14 of the second set of lease amendments states, "Section 54 of the original Lease ... is hereby deleted in its entirely and

---

[8]    Unit 5 claims we should not address the arguments McKinney presents in its cross-appeal because judgment was entered for McKinney, so McKinney is not an "aggrieved" party with standing to appeal. (See Code Civ. Proc., § 902 ["Any party *aggrieved* may appeal in the cases prescribed in this title."], italics added.) We disagree. " ' "[A]ny party aggrieved by an appealable [judgment] has a right to appeal therefrom, even though the [judgment] is in form apparently favorable to him." ' [Citation.] 'One is considered "aggrieved" whose rights or interests are injuriously affected by the judgment. [Citations.]' [Citation.] We liberally construe the issue of standing and resolve doubts in favor of the right to appeal." (*Apple, Inc. v. Franchise Tax Bd.* (2011) 199 Cal.App.4th 1, 13.)

Applying these principles here, we conclude McKinney was aggrieved by the judgment insofar as the court rejected McKinney's claim that Paragraph 39.2 was not operative when McKinney exercised the option, and its assertion that it was in full possession of the premises—issues that were material to the judgment, will impact the ongoing relations of the parties, and potentially could be entitled to preclusive effect in the still-pending civil litigation. (See *id.* at pp. 15–16.) Further, even if we were to agree with Unit 5 that McKinney does not have standing to appeal, we would address McKinney's arguments as they are possible alternative grounds on which to affirm the judgment. (See *1041 20th Street, LLC v. Santa Monica Rent Control Bd.* (2019) 38 Cal.App.5th 27, 32, fn. 3.)

16

replaced with the following ...."[9]  This language shows that when the parties intended to nullify or supersede a paragraph from the lease or the lease addendum, they knew how to do so with express language effectuating their intent.  Because the lease amendments do not delete and replace Paragraph 39.2 in a similar manner, we necessarily assume the parties did not intend to nullify Paragraph 39.2 *sub silentio*, by relying on a boilerplate contract provision in the lease amendments that does not mention options and is broadly applicable to the entire set of amendments.  (See *Bath v. State of California* (2024) 105 Cal.App.5th 1184, 1207, fn. 15 [use of limiting phrase in one part of contract "demonstrate[d] that the parties knew how to limit provisions to particular sections when that was their intention"]; *Central Building, LLC v. Cooper* (2005) 127 Cal.App.4th 1053, 1061 ["The lease termination agreement expressly terminated the prior personal guaranty agreements.  This action demonstrates that the parties knew how to terminate a personal guaranty when that was their intent."].)

Our conclusion is bolstered by the fact that the lease amendments do not include replacement rules or requirements governing McKinney's exercise of the options that it might receive from Unit 5, which one would reasonably expect to be included in the amendments if the parties had intended them to nullify and replace Paragraph 39.2.  Paragraph 9 is the only paragraph in the amendments that pertains to options.  However, it does not provide general rules applicable to all options Unit 5 might grant McKinney,

---

[9]     Section 54 of the addendum permitted Unit 5 to relocate McKinney to an equal or better space contingent on Unit 5 paying the relocation costs.

17

which is the subject matter of Paragraph 39.2. Instead, it modifies and replaces the option itself (Paragraph 57 of the lease addendum).[10]

Because the second set of lease amendments do not expressly nullify or supersede Paragraph 39.2, or provide substitute rules and requirements for those spelled out in Paragraph 39.2, we—like the trial court—conclude the parties did not intend the lease amendments to nullify or supersede Paragraph 39.2.

b. *McKinney Did Not Satisfy the Full Possession Condition*

Next, we consider whether the trial court correctly interpreted the full possession condition in Paragraph 39.2. The court found the parties intended the full possession condition to mean that McKinney could exercise the renewal option only if it had not assigned or subleased any portion of the leased premises. Once more, we agree with the trial court.

The lease does not define full possession. Therefore, we may rely on common understandings and dictionary definitions of the words composing the phrase to determine its meaning. (See Civ. Code, § 1644 ["The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed."]; *Gordon v. Continental Casualty Co.* (2024) 107 Cal.App.5th 89, 103 ["To determine the ordinary meaning of the words of a contract, we may consider the dictionary definitions of the words."].)

---

[10] Paragraph 9 of the second set of lease amendments tracks the language of Paragraph 57 nearly verbatim, changing only the deadline by which McKinney may exercise its option (180 days prior to the end of the lease, up from 120 days), and acknowledging that McKinney has a right to notice and an opportunity to cure any default under the lease.

Merriam-Webster's Dictionary defines "full" as "complete especially in detail, number, or duration," and "being at the highest or greatest degree."[11] It defines "possession" as "control or occupancy of property without regard to ownership."[12] Meanwhile, it defines "assignment" as "the transfer of property,"[13] and "sublease" as "a lease by a tenant or lessee of part or all of leased premises to another person but with the original tenant retaining some right or interest under the original lease."[14] These definitions suggest the parties intended the full possession condition to mean McKinney can exercise an option only if it has complete control or occupancy of the leased premises—something it cannot achieve if it has leased or transferred all or a portion of the premises to another entity through an assignment or sublease.

The placement and context of the full possession condition also supports this reading. (See *State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 195 [" ' "[L]anguage in a contract must be construed in the context of that instrument as a whole" ' "]; *Ford, supra*, 110 Cal.App.5th at p. 565 ["We consider the contract as a whole and interpret the language in

---

11    Merriam-Webster's Online Dict. (2026) <https://www.merriam-webster.com/dictionary/full, at par. 2a> [as of Apr. 22, 2026], archived at <https://perma.cc/FJA6-RND6>.

12    Merriam-Webster's Online Dict. (2026) <https://www.merriam-webster.com/dictionary/possession, at par. 1b> [as of Apr. 22, 2026], archived at <https://perma.cc/4H4V-BXK8>.

13    Merriam-Webster's Online Dict. (2026) <https://www.merriam-webster.com/dictionary/assignment, at par. 3> [as of Apr. 22, 2026], archived at <https://perma.cc/384Z-LXM4>.

14    Merriam-Webster's Online Dict. (2026) <https://www.merriam-webster.com/dictionary/sublease> [as of Apr. 22, 2026], archived at <https://perma.cc/MP5B-QR6T>.

context, rather than interpret a provision in isolation."].)  The full possession condition is set forth in Paragraph 39.2.  Immediately prior to the full possession condition, Paragraph 39.2 states that any option granted to McKinney "is personal to [McKinney], and cannot be assigned or exercised by anyone other than [McKinney] ...."  Then, immediately after the full possession condition, Paragraph 39.2 provides that, at Unit 5's request, McKinney must "certify[] that [it] has no intention of ... assigning or subletting" the premises after McKinney exercises the option.

In its statement of decision, the trial court reasoned that the language and context of the full possession condition showed that "Unit 5 wanted to ensure that McKinney would not be exercising the Option in order to assign the Lease or sublet the Property to third parties during the extended term of the Lease.  It also confirms ... that 'full possession' means McKinney has not assigned or sublet a portion of the Property at the time of the exercise of the Option."  We agree with the court's sound analysis on this issue.

McKinney does not grapple with the dictionary definitions of the words "full" and "possession," as discussed above, nor does it discuss the context and placement of the full possession condition.  Instead, McKinney cites Code of Civil Procedure section 1161, the unlawful detainer statute, and case law interpreting it, and claims this statute conclusively establishes that a sublease does not deprive a lessee of full possession of the leased premises. In relevant part, the unlawful detainer statute states, "A tenant of real property ... is guilty of unlawful detainer ... When the tenant continues in *possession*, in person *or by subtenant*, of the property, or any part thereof, after the expiration of the term for which it is let to the tenant."  (Code Civ. Proc., § 1161, subd. (1) italics added.)

20

McKinney's argument is unpersuasive. As an initial matter, the lease does not cite the unlawful detainer statute or provide any indication that the parties intended to borrow from, or incorporate the meaning of, any language from the unlawful detainer statute. (See *Horsemen's Benevolent & Protective Assn. v. Valley Racing Assn.* (1992) 4 Cal.App.4th 1538, 1562 ["Although the term used in the contract is the same term used in [the statute], the issue before the court was not the interpretation of the statutory language but of the intent of the parties in entering into the contract."].) In any event, the full possession condition does not use the same language as the unlawful detainer statute. The unlawful detainer statute is a procedural statute specifying when an unlawful detainer action may be brought against a tenant in "possession" of property, whereas the condition at issue requires McKinney to be "full possession" of the premises to exercise the option. (See *Stancil v. Superior Court* (2021) 11 Cal.5th 381, 394–395.) For both of these reasons, we reject McKinney's effort to import meaning from the unlawful detainer statute into the full possession condition set forth in Paragraph 39.2.

Now that we have deciphered the meaning of the full possession condition, we turn to the trial court's finding that McKinney did not satisfy the condition. Our discussion will be brief. Throughout this litigation, McKinney has never disputed that it subleased 4.3 acres of the leased premises to Charger for a term extending through December 31, 2028, and that the Charger sublease was operative when McKinney purported to exercise the option. Given these undisputed facts, we affirm the trial court's factual determination that McKinney did not satisfy the full possession

21

condition because it did not have full possession of the leased premises at the time that it purported to exercise the option.[15]

### c. *The Lease Did Not Require Unit 5 to Provide McKinney with Notice and Opportunity to Cure its Lack of Full Possession*

Finally, we address whether the lease required Unit 5 to provide McKinney with notice of its failure to satisfy the full possession condition, and a 30-day opportunity to regain full possession of the leased premises, before Unit 5 could reject McKinney's exercise of the option. The trial court found the lease imposed such a requirement. We conclude otherwise.

In finding McKinney was entitled to notice and an opportunity to cure, the trial court reasoned that the full possession condition in Paragraph 39.2 is a "condition" of the lease, and Paragraph 13.1 defines a "default" of the lease as "a failure by [McKinney] to comply with or perform any of the terms, covenants, *conditions* or Rules and Regulations under th[e] lease." (Italics added.) Therefore, the court found, McKinney's failure to satisfy the full possession condition constituted a "default" under the lease. The court then referred to the operative version of the option (Paragraph 9 of the second set of lease amendments), and determined that it required Unit 5 to provide McKinney with notice and a 30-day opportunity to cure its default because the option states, "Provided [McKinney] is not in Default of the Lease *beyond any applicable notice and cure period*, [McKinney] shall have one (1), five (5) year Option to renew the Lease."

We respectfully disagree with the trial court's analysis on this issue. Like Unit 5, we construe Paragraph 39.2 as setting forth a condition precedent governing the option, and the option itself (Paragraph 9 of the

---

[15] Our conclusion renders it unnecessary for us to determine whether the DLR license agreement independently precluded McKinney from satisfying the full possession condition.

second set of lease amendments) as setting forth a separate and independent condition precedent for the option. "In contract law, a 'condition precedent' is 'either an act of a party that must be performed or an uncertain event that must happen before the contractual right accrues or the contractual duty arises.'" (*Wm. R. Clarke Corp. v. Safeco Ins. Co.* (1997) 15 Cal.4th 882, 885, fn. 1.) Here, Paragraph 39.2 includes a condition precedent requiring McKinney to be in full possession of the leased premises to exercise the option. Meanwhile, the option sets forth a distinct condition precedent that McKinney may exercise the option only if it is not in default under the lease. In rejecting McKinney's exercise of the option, Unit 5 relied on McKinney's failure to satisfy the former condition precedent, not the latter. Because Unit 5 did not claim a default of the lease, its rejection of the option did not trigger the notice and cure provisions governing lease defaults.[16]

Further, we disagree with the trial court's finding that McKinney breached the lease based on its failure to remain in full possession of the leased premises. Paragraph 12 of the original lease permitted McKinney to sublease the premises and, with Unit 5's consent, to assign its interests in the lease to an approved assignee. When the parties adopted the second set of lease amendments, they again agreed (in paragraph 15) that McKinney could enter subleases and assign its lease interests, so long as it obtained Unit 5's prior permission. However, under the trial court's logic, the very same conduct expressly permitted by the lease—i.e., the act of entering an authorized sublease or assignment—would simultaneously constitute a

---

[16] Because Unit 5 did not rely on the condition precedent contained in the option itself (the condition requiring that McKinney not be in default of the lease) when it rejected McKinney's attempted exercise of the option, we need not and do not decide whether McKinney's failure to obtain Unit 5's permission for the DLR license agreement constituted a default of the lease, triggering McKinney's right to notice and an opportunity to cure.

default under the lease based on the full possession condition, which could then mature into a breach of the lease after a notice-and-cure period. We cannot endorse this construction of the lease, which seemingly places the lease's provisions directly at odds with one another.

Instead, we interpret Paragraph 13.1 to mean that McKinney is in default of the lease if it fails to comply with, or perform, the terms, covenants, and *promissory* conditions of the lease. As one leading treatise explains, "A promise in a contract creates a legal duty in the promisor and a right in the promisee." (8 Corbin on Contracts (2026) § 30.12.) "The non-fulfillment of a promise is called a breach of contract, and it creates in the other party a secondary right to damages. It is the failure to perform a legal duty." (*Ibid.*) By contrast, "a condition is a fact or an event, not an expression of intention or an assurance." (*Ibid.*) A "fact or event constituting a condition creates no right or duty and is merely a limiting or modifying factor." (*Ibid.*) Generally, "[t]he non-occurrence of a condition will prevent the existence of a duty in the other party; but it may not create any remedial rights and duties at all, and it will not unless someone has promised that it shall occur." (*Ibid.*) However, "a contract can be made to create a *duty* that a fact, as a condition, shall come into existence. That is, it is both a promise and a condition. ... Such a condition might be described as a promissory condition." (*Ibid.*)

Another leading treatise on contract law discusses conditions and promises in similar terms. It provides, "A promise is a manifestation of an intention to act or refrain from acting in a specified way, so made as to justify the promisee in understanding that a commitment has been made, while a condition is an event, not certain to occur, which must occur, unless its nonoccurrence is excused, before performance under a contract becomes due." (13 Williston on Contracts (4th ed. 2025) § 38:5.) "Breach of a promise ...

24

subjects the promisor to liability in damages but does not necessarily excuse performance on the other side.  Nonoccurrence of a condition prevents the promisee from acquiring a right, or deprives it of one, but subjects it to no liability." (*Ibid.*, fn. omitted.)  "If it is evident that the parties employed one word (condition) in their agreement, but the sense in which they used the word made clear that they intended to bind one party to a promise that a particular event would occur, that intention will be effectuated, and the party subject to that particular 'condition' will be responsible for seeing that the specified event occurs." (*Id.*, § 38:13.)  In other words, "[a] provision may be both a condition and a promise if one of the parties ... agrees to ensure that the condition will occur; and if this independent promise to perform the condition is breached, and the condition does not occur, the promisor will be liable for damages occasioned by the breach." (*Id.*, § 38:15.)

With these principles in mind, the most reasonable interpretation of the word "conditions," as it is used in Paragraph 13.1 of the lease, is that McKinney stands in default under the lease if it fails to perform or fulfill the *promissory* conditions it has assumed under the lease.  That interpretation of the lease reconciles Paragraph 13.1 (defining "breach" and "default"), on the one hand, with Paragraph 12 of the lease and Paragraph 15 of the lease amendments (which authorize McKinney to enter approved assignments and subleases), on the other hand, by ensuring that an act expressly authorized by the lease does not concurrently constitute a breach of the lease.  (See Civ. Code, § 1641 ["The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."]; *id.*, § 1652 ["Repugnancy in a contract must be reconciled, if possible, by such an interpretation as will give some effect to the repugnant clauses, subordinate to the general intent and purpose of the whole

25

contract."]; *Southern Pacific Land Co. v. Westlake Farms, Inc.* (1987) 188 Cal.App.3d 807, 823 ["traditional rules of construction ... require the lease to be read as a whole in a manner which reconciles apparent repugnancies and, to the extent possible, gives some meaning to each clause in the lease"].)

Having determined that a "default" refers to a failure by McKinney to comply with, or perform, its *promissory* conditions, we conclude the court erred in finding McKinney's failure to satisfy the full possession condition was a default. Under the lease, McKinney had the *right* to renew the lease by exercising the option—but only if it satisfied the full possession condition. The full possession condition was a condition precedent in the usual sense, as it was "an act of a party that must be performed or an uncertain event that must happen before [a] contractual right accrues or [a] contractual duty arises." (*Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 313.) However, McKinney did not *promise* to stay in full possession of the leased premises, or assume an *obligation* to do so. (See *Britschgi v. McCall* (1953) 41 Cal.2d 138, 144 ["An express condition precedent to performance by a party cannot be construed as imposing a duty on that party to fulfill the condition, where ... the language employed does not constitute an undertaking to do so."].) Absent such an obligation or promise, McKinney did not breach the lease.

Because Unit 5 rejected McKinney's exercise of the option based on its failure to satisfy the full possession condition governing the exercise of the option—not its breach of the lease—we conclude the trial court erred in finding Unit 5 was required to provide McKinney with notice and an opportunity to cure. Given that the lease did not require Unit 5 to provide McKinney with notice and an opportunity to cure, we conclude Unit 5

26

properly rejected the option, subject to the outcome of the second phase of trial on McKinney's affirmative defenses.[17]

C. *Postjudgment Cost Award*

In addition to challenging the unlawful detainer judgment, Unit 5 also appealed a postjudgment order awarding $60,737.31 in trial costs to McKinney as the prevailing party in the proceedings below. "Our reversal of the judgment ... necessarily compels the reversal of the award of ... costs to [McKinney] based on the judgment because ' "[a]fter reversal of a judgment 'the matter of trial costs [is] set at large.' " ' " (*Bevis v. Terrace View Partners, LP* (2019) 33 Cal.App.5th 230, 263; see *Merced County Taxpayers' Assn. v. Cardella* (1990) 218 Cal.App.3d 396, 402 ["An order awarding costs falls with a reversal of the judgment on which it is based."].) Therefore, we reverse the postjudgment order awarding costs to McKinney.

---

[17]    In light of our determination that the lease did not entitle McKinney to notice and an opportunity to cure its failure to satisfy the full possession condition, it is unnecessary for us to determine whether the court erroneously ruled on McKinney's affirmative defenses during the first phase of trial, or whether Unit 5 in fact fulfilled its notice and cure obligations when it rejected the exercise of the option and filed the civil lawsuit against McKinney.

IV

DISPOSITION

The judgment and the postjudgment order awarding trial costs are reversed, and the matter is remanded for further proceedings on Respondent's affirmative defenses.  Appellant is entitled to its costs on appeal.

McCONNELL, P. J.

WE CONCUR:

KELETY, J.

CASTILLO, J.